Eastern District of Kentucky
FILED

SEP 3 0 2006

AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON**

CIVIL ACTION NO. 04-212-DLB

**729, INC., ET AL.**                                          **PLAINTIFFS**

vs.                                  **OPINION & ORDER**

**KENTON COUNTY FISCAL COURT**                    **DEFENDANT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This is an action under 42 U.S.C. § 1983 presenting constitutional challenges to Kenton County's adult entertainment licensing ordinance. The Court has general federal question jurisdiction, pursuant to 28 U.S.C. § 1331. For the reasons discussed herein, the Court concludes the County's present licensing scheme does not run afoul of Plaintiffs' First Amendment and other constitutional concerns.

**BACKGROUND**

In August of 2004, the Kenton County Fiscal Court (hereinafter "Kenton County" or "Fiscal Court") adopted Ordinance No. 451.7, directed to the licensing and regulation of adult businesses in Kenton County.[1] Briefly, Ordinance No. 451.7 sought to define the scope of adult businesses and entertainers to whom the ordinance applied; to set up a program for the application and issuance of licenses to operate or to be employed in such regulated business activities; to set parameters for how, where, and when sexually oriented

---

[1]The County's prior legislation regulating "Sexually Oriented Business Activity" was via Ordinance No. 451.6, enacted October 5, 1999. Whether or to what extent this prior Ordinance has actually been enforced by the County is not specified by the parties.

entertainment activities could occur; and to provide a process for inspection and enforcement of the Ordinance provisions, through point assessment with progressive license penalties and/or misdemeanor criminal charges for violations.

This action was filed following adoption of Ordinance No. 451.7. Plaintiffs – consisting of four adult entertainment establishments within Kenton County and three of the persons working at these clubs – filed suit for declaratory and injunctive relief.[2] Plaintiffs' enumerated claims[3] as to Ordinance No. 451.7 were:

(1) That it constitutes unlawful content-based restriction on speech in violation of the First Amendment applicable to states via the Fourteenth Amendment, as well as the Kentucky Constitution;

(2) That its imposition of licensing prior to engaging in protected expression imposes an impermissible prior restraint on speech violative of the First and Fourteenth Amendments and the Kentucky Constitution;

(3) That it is overbroad in its reach and vague in delineating the scope of conduct prohibited thereunder, in violation of the First and Fourteenth Amendments and § 2 of Kentucky's Constitution;

(4) That its prohibition of private, non-obscene conversations between adults on private property violates the substantive due process guarantees of the Fifth and Fourteenth Amendments and Kentucky Constitution;

(5) That its required licensing fees exceed administrative cost to administer the licensing process, thereby imposing an impermissible tax on the exercise of a protected constitutional right;

(6) That its in-state residency requirement restricts the constitutional right to travel and dormant Commerce Clause, thereby violating the Fourteenth Amendment and Kentucky Constitution;

---

[2]The named Plaintiff club establishments are 729, Inc., d/b/a Rodney's; Foxx Restaurants, Inc., d/b/a Viva LaFoxx; Foster, Inc., d/b/a The Pad; and The Venus Lounge, Inc., d/b/a Club Venus. The individual Plaintiff entertainers are Patsy Hiatt and Tina Sturgeon, employed with Club Venus, and Wanda Blankenship, employed with Viva LaFoxx.

[3]Each number below corresponds to the numbered Counts of Plaintiffs' Complaint.

(7)   That its disclosure provisions violate Fourteenth Amendment privacy rights and the Kentucky Constitution;

(8)   That its provisions disqualifying from licensing those with certain speech-related criminal convictions impermissibly infringes on the right of free expression in violation of the First and Fourteenth Amendments, the cruel and unusual punishment clause of the Eighth Amendment, and the Kentucky Constitution;

(9)   That its provisions for imposing suspension and/or revocation penalty points against owners for conduct of others without prior knowledge violates the Fourteenth Amendment and the Kentucky Constitution;

(10)  That its restriction upon private adult conversations violates constitutional free association rights;

(11)  That its provisions restricting entertainers who have conversed with patrons from engaging in performances violates the right to engage in expressive conduct protected by the First and Fourteenth Amendments and the Kentucky Constitution;

(12)  That certain provisions (primarily hours of operation) impose improper time, place, and manner restrictions upon the exercise of protected expression;

(13)  That its provisions for inspection of licensed establishments amounts to warrantless, unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments and the Kentucky Constitution;

(14)  That its provisions rewarding self-incrimination and discouraging silence relating to license suspension and revocation violate the Fifth Amendment prohibition against self-incrimination applied to the states via the Fourteenth Amendment and the Kentucky Constitution;

(15)  That its provisions on the presentation of dance performances unconstitutionally impose content-based time, place, and manner restrictions not supported by a substantial government interest;

(16)  That Plaintiffs are already licensed pursuant to a preemptive City of Covington ordinance that is the same as or more stringent than Kenton County's Ordinance No. 451.7 standards; and,

(17)  That pursuant to state statute, the City of Covington licensing fee paid by Plaintiffs is credited against any Kenton County licensing fee imposed.

In conjunction with the filing of their Complaint, Plaintiffs moved for a preliminary injunction and later for a temporary restraining order to prohibit the enforcement of Ordinance No. 451.7 pending the Court's adjudication of its constitutionality. The request for temporary restraining order was set for oral argument. Prior to the scheduled argument, Plaintiffs voluntarily withdrew that motion. The parties agreed to a briefing schedule on the preliminary injunction motion, with a hearing date scheduled for those issues the parties were unable to submit on the briefs.

Shortly before the scheduled hearing date, Plaintiffs moved for leave to file an amended complaint. By this time, Defendant had twice amended Ordinance No. 451.7, via Ordinance Nos. 451.9 and 451.10, since the filing of Plaintiffs' Complaint. Plaintiffs' proposed amended complaint substantively raised the same seventeen counts set forth in their original Complaint. It also added three additional claims:

(18)   Interference with Right to Contract in violation of Article 1, Section 10 of the U.S. Constitution in that Kenton County's regulation of the businesses impairs the contract Plaintiffs entered into with the City of Covington in prior litigation over the City's licensing program;[4]

(19)   Taking without Just Compensation in violation of the Fifth and Fourteenth Amendments and the Kentucky Constitution in that Kenton County's program deprives Plaintiffs of a protected property interest by impairing the contractual agreement between Plaintiffs and the City of Covington; and,

(20)   Violation of the Separation of Powers doctrine by the County's efforts to have this Court interfere with a settlement agreement between Plaintiffs and the City of Covington previously accepted by this Court.

---

[4]That prior litigation, *729, Inc., d/b/a Rodney's, et al. v. Board of Commissioners of the City of Covington, et al.*, Eastern District of Kentucky, Covington Division, Case No. 99-198, challenged the City of Covington's licensing regulations over sexually oriented businesses. The parties to that action ultimately reached a compromise settlement in late December, 1999, and the matter was dismissed with prejudice on January 6, 2000.

At the call of this case for preliminary injunction hearing, the parties announced they had reached a compromise interim arrangement on enforcement of Kenton County's adult business Ordinance pending further prosecution and adjudication of Plaintiffs' claims herein. Specifically, Plaintiffs were granted leave to file their Amended Complaint,[5] and the parties agreed to file further briefs addressing the additional claims raised in the Amended Complaint.

The parties also agreed that Ordinance No. 451.10 would be enforced by Kenton County as of January 1, 2005, with the exception of enforcement against Plaintiffs in two subject areas – the fee requirement associated with a license and the prohibition against commingling between patrons and entertainers following stage performances. The parties were given a schedule for discovery on these two issues, with cross motions for summary judgment on these points to be filed thereafter, along with any other facial challenges by Plaintiffs. The parties also agreed that until such time as the Court addressed the fee and commingling issues, Plaintiffs would continue to abide by and be subject to the enforcement of the license fee and commingling provisions of the City of Covington's ordinance. The parties' agreement also preserved Plaintiffs' right to continue to assert any of the challenges raised in their Complaints.

In the agreement, Defendant reserved the right to continue to make revisions or amendments to the Ordinance during pendency of this action. It has, in fact, so amended its adult entertainment licensing ordinance through two further enactments – Ordinance

---

[5]In addition to the filing of an Amended Complaint, another club and its owner – Liberty's Show Lounge, Inc. and Kim Foran – have intervened. They join in the claims and motions filed to date by the original Plaintiffs.

5

Nos. 451.11 and 451.12. At the time the cross dispositive motions were filed, Ordinance No. 451.12 had been adopted and was the version of the licensing scheme argued by the parties. This particular Ordinance has remained in effect to the present date.[6]

A brief overview of Ordinance 451.12, the current Kenton County ordinance, is in order. Among other forms of covered sexually oriented businesses, Ordinance 451.12 covers cabarets and sexually oriented theaters providing sexually oriented entertainment, defined as activities at a sexually oriented business of dancing, singing, talking, modeling, gymnastics, acting, other forms of performing, or individual conversations with customers for which some type of remuneration is received, when performed by a sexually oriented entertainer. A sexually oriented entertainer is one who frequently appears in a state of semi-nudity at a business subject to the Ordinance.

Sexually oriented businesses are required to obtain a business license to operate. Sexually oriented entertainers and managers of sexually oriented businesses must also obtain a license in order to provide services in or for a sexually oriented business covered by the Ordinance. The business license fee is $3,000 annually, with 50% of the fee refunded if an application is denied. License fees for managers and entertainers are $155 annually.

Applications forms with the required information for either a business or an entertainer's or manager's license are submitted to the County License Inspector. Provided that applicants satisfy background requirements and submit a complete and accurate application with required fees, and provided that additional premises-related

---

[6]Although it can be found at Chapter 113 of Kenton County's Code of Ordinances, for purposes of this action the legislation is referenced in its uncodified state.

requirements for businesses have also been satisfied, the License Inspector is to issue the individual or business privilege license.

The Ordinance also specifies a time line for processing of applications. The License Inspector must determine within five business days whether the application is complete. If incomplete, the Inspector notifies the applicant of missing items. The License Inspector must approve or deny the application within thirty days of completion of the application, notifying the applicant of his specific findings within five business days post-decision. The Inspector or an applicant can request a hearing or, if the application is denied without a hearing, the applicant can request a hearing. License Inspector hearings must be completed within a specified time. A decision with findings must be made by the license inspector within five business days after the hearing. At the latest, a decision must be made within sixty days of filing a completed application.

The Ordinance also provides a mechanism for reconsideration. Specifically, if denied a license by the License Inspector, the applicant can make a timely request for a hearing and reconsideration. The Hearing Officer, who is appointed by the Kenton County Fiscal Court, must conduct the hearing and render a decision within thirty days. The hearing is conducted in accordance with state statute. Or, rather than request a hearing, the applicant may immediately seek judicial review as available by law, or can opt to request judicial review after a Hearing Officer has reconsidered the application.

The present licensing scheme also provides for the issuance of a temporary license to existing businesses within five business days of filing a completed application. The temporary license remains in place until a final determination is made on the application. For new issuances, if an application is denied and administrative reconsideration or judicial

7

review is sought, upon request the applicant can have a temporary license issued for the pendency of the appeal proceedings.

Establishment and manager's licenses are to be posted on the premises, and entertainers' licenses maintained on the premises, available for inspection. Under the licensing program, various affirmative duties are imposed upon license holders, with assessment of penalty points for violations thereof. Some of these duties include restricted hours of operation and specified lighting requirements during those hours; ensuring that no defined specified sexual activity, prostitution, solicitation for prostitution, or sale of illegal drugs occurs on the premises; and ensuring that one associated with ownership of the establishment has no subsequent sex-related convictions or license revocations under the Ordinance. The enumerated duties also include ensuring that entertainers perform in a room of a required size, on a stage separated at least 5 feet from the customer area and elevated 24 inches above patron level. Entertainers may appear semi-nude only in public areas of the establishment and only while on-stage. Managers' stations must have a clear view of all areas open to the public. For the first hour after appearing semi-nude, entertainers are prohibited from being within five feet of customers areas of the premises. The duties call for law enforcement to have open access to public portions of the premises during business hours and the opportunity to inspect to ensure compliance.

Points are assessed against the licensee for violations of the various affirmative duties. Accumulation of points can result in suspension to ultimately revocation of a license. The assessments can be challenged via a hearing process, then subsequent judicial review if desired, during which time the status quo is maintained until completion of the challenge process. In addition to the assessment of points, certain Ordinance

8

violations such as operating on a suspended or revoked license or operating without a license, are subject to criminal charges of a Class B Misdemeanor for the first violation and Class A Misdemeanor for the second offense.

Now pending before the Court are the parties' cross dispositive motions on this regulatory program. (Docs. #41, 42, 44, 46). With the exception of Counts VI and XVII,[7] the cross motions seek summary judgment on all claims asserted in the Amended Complaint.[8]

## DISCUSSION

### A.   <u>Standard of Review</u>

Summary judgment should be granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A court's function is to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A summary judgment will only be precluded by disputed facts which are material, i.e., "might affect the outcome of the suit under the governing law." *Id.* at 248. The moving

---

[7]Count VI challenged that provision of Ordinance 451.7 that required in-state residency. Plaintiffs argued the section was unconstitutional in that it burden their right to interstate travel protected under the Dormant Commerce Clause. Through subsequent amendment, the Fiscal Court eliminated the residency requirement from the licensing scheme.

Although Count XVII raises a challenge to and seeks credit against the County's Ordinance for the fees paid to the City of Covington, neither party addresses this claim in their respective dispositive motions. Because the Plaintiffs largely ignored or appear to have abandoned this claim, the Court declines to address it here.

[8]Plaintiffs' Amended Complaint also asserts state constitutional claims generally, for the most part without reference to a particular section of the Kentucky Constitution. Since no separately identified arguments on the state constitution claims were raised by Plaintiffs, it is presumed that those state-law claims were intended to parallel the federal constitutional claims.

party bears the initial responsibility of informing the court of the basis for its motion and pointing to evidence, or lack thereof, demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once this burden is met, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250. While all inferences drawn from the factual record are viewed in the light most favorable to the nonmoving party, *Siggers-El v. Barlow,* 412 F.3d 693, 699 (6th Cir. 2005), the nonmoving party cannot rest on pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586 (1986). In the context of a § 1983 action, this means the nonmovant must demonstrate a genuine issue of material fact as to the deprivation of a right secured by the Constitution or laws of the United States, and that the deprivation was caused by a person acting under color of state law. *Ellison v. Garbarino,* 48 F.3d 192, 194 (6th Cir. 1995).

### B.    Defendant's Regulation of Sexual Expression

Plaintiffs argue that Kenton County's Ordinance is directed at "expression" that is protected by the First Amendment. "Expression" protected by the First Amendment includes conduct that contains or communicates an erotic message, *Schad v. Borough of Mt. Epraim,* 452 U.S. 61, 66 (1981), including nude and semi-nude dancing, *Barnes v. Glen Theatre,* 501 U.S. 560, 581 (1991)(Souter, J., concurring). As the Sixth Circuit has noted, "dancing as a performance directed to an actual or hypothetical audience gives expression at least to generalized emotion or feeling, and where the dancer is nude or nearly so the

10

feeling expressed, in the absence of some contrary clue, is eroticism, carrying an endorsement of erotic experience." *DLS, Inc. v. City of Chattanooga,* 107 F.3d 403, 409 (6th Cir. 1997)(quoting *Barnes,* 501 U.S. at 581 (Souter, J., concurring)). The Ordinance in this case, dealing generally with sexually oriented entertainment and the establishments providing same, thus involves expression recognized as being afforded First Amendment protections.

Plaintiffs contend that the Ordinance in question is a content-based restriction on sexually expressive conduct and therefore presumptively invalid.[9]  Where the erotic message is sought to be enhanced by nudity, such expression is given lesser protection than other forms of speech because it falls on the outer fringes of First Amendment rights of free speech and expression. *Barnes,* 501 U.S. at 566 (plurality opinion).  As the Supreme Court explained in *City of Erie v. Pap's A.M.,* 529 U.S. 277 (2000), in examining the constitutional validity of such expression

> we must decide "whether the State's regulation is related to the suppression of expression." (citations omitted).  If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the "less stringent" standard from [*United States v. O'Brien,* 391 U.S. 367, 377 (1968)] for evaluating restrictions on symbolic speech.   If the government interest is related to the content of the

---

[9]Plaintiffs' Complaints were directed to Ordinance No. 451.7 and its early amendments. Plaintiffs continue to assert the validity of these challenges.  However, the Ordinance has since been amended, the latest version being No. 451.12, and it is this version of the licensing program that will be examined in this case. *See Cam I, Inc. v. Louisville/Jefferson Co. Metro Gov't,* 460 F.3d 717 (6th Cir. 2006)(wherein court reviewed amended version of legislation, citing *Kentucky Right to Life v. Terry,* 108 F.3d 637, 639, 644 (6th Cir. 1997)).  The licensing scheme as amended contains significant changes. Prior versions of the Ordinance were not enforced against Plaintiffs or otherwise, nor is there an indication from Defendant that it so intends to enforce these prior versions unlike, for example, in *Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville & Davidson Co.,* 274 F.3d 377, 387 (6th Cir. 2001), wherein the appellate court reviewed an earlier version of the subject ordinance because the defendant had made clear its intent to reenact these portions, which had been declared unconstitutional by the trial court.

> expression, however, then the regulation falls outside the scope of the
> *O'Brien* test and must be justified under a more demanding standard.

*Pap's A.M.,* 529 U.S. at 289 (citation omitted). Thus, if legislation is aimed at suppressing

protected speech, the ordinance must further a vital government interest by the least

restrictive means. *Elrod v. Burns,* 427 U.S. 347, 361 (1976). But as the Supreme Court

explained in *Barnes v. Glen Theatre,* if the legislation is content-neutral in that it is directed

not at suppressing the expressive conduct but at minimizing negative secondary effects

of the protected expression, it does not offend First Amendment rights to regulate the

sexually oriented businesses, provided the ordinance satisfies the test articulated by the

Supreme Court in *United States v. O'Brien,* 391 U.S. 367 (1968). That test requires the

ordinance (1) be within the constitutional power of the government; (2) further an important

or substantial governmental interest; (3) provide an asserted governmental interest

unrelated to the suppression of free expression; and, (4) ensure that any incidental

restriction on alleged First Amendment freedoms is no greater than essential. *Barnes,* 501

U.S. at 566 (citing *O'Brien,* 391 U.S. at 376-77).

This raises the question, is the County's Ordinance content-neutral, or is it aimed

at suppressing the club and entertainer's erotic message? Plaintiffs contend the licensing

scheme seeks to restrict their nonobscene, sexually expressive speech based upon the

content of that speech and is, therefore, constitutionally impermissible. The County, of

course, submits that the intent of the scheme is content-neutral.

Legislation is considered "content-based" if it seeks to regulate protected speech

based on the "message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791

(1989). It is considered "content-neutral" if the regulation is "justified without reference to

12

the content of the regulated speech," or serves a purpose unrelated to the expression's content. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293-95 (1984). This purpose can include targeting the secondary effects such businesses create and not the sexually oriented expression itself. *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425 (2002)(plurality opinion). In *Alameda Books,* the Supreme Court explained that a government entity "certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary impacts." *Id.* at 437. The regulation is still deemed content-neutral if it has merely an incidental effect on protected speech. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48 (1984). The Supreme Court and the Sixth Circuit, applying Supreme Court precedent, have held that controlling secondary effects of protected expression is not regulating the protected expression itself and is therefore content neutral. *See e.g., Barnes v. Glen Theatre, Inc.,* 501 U.S. at 584 (Souter, J., concurring)(recognizing "secondary effects as a sufficient basis for governmental regulation of sexually oriented businesses"); *Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129, 131-34 (6th Cir. 1994)(discussing in detail the plurality and concurring opinions in *Barnes* and concluding that Justice Souter's "secondary effects" rationale embodied the Court's holding).

Evidence of secondary effects can come from a variety of sources. Local governments may rely upon studies "already generated by other cities, so long as whatever evidence the [government entity] relies upon is reasonably believed to be relevant to the problem that [it] addresses." *City of Renton,* 475 U.S. at 51-52. It can also rely upon previous findings in judicial opinions about secondary effects resulting from the presence

13

of adult entertainment businesses. *Id.* at 50-51; *Pap's A.M.,* 529 U.S. at 297 (plurality opinion).

In this case, Kenton County relied upon information from a variety of sources in considering Ordinance 451.7.[10]  As noted in the Ordinance preamble, this information includes studies by other cities; the findings of a consulting firm hired by the County in partnership with the Northern Kentucky Area Planning Commission to examine adult businesses in the Northern Kentucky area; judicial standards and holdings, including the 1993 decision from this Court addressing a licensing scheme for Newport, Kentucky, Covington's sister city; police call statistical reports; and testimonial evidence from public hearings and consultation with city and county officials and prosecutors and city planners about the effects of sexually oriented businesses in the immediate community. The County determined that, based upon this information, criminal conduct in the form of robbery, assaults, fraud, malicious mischief, public intoxication, possession of illegal drugs, and prostitution were recognizable threats; that public health and safety are compromised by such criminal activities or potential therefor and the spread of communicable diseases through unlawful sexual contacts; and that deterioration of downtown areas or areas surrounding such establishments with the inability to attract new businesses and customers or residents is seen, at a time when both the City of Covington and its Licking River neighbor Newport have been developing their river fronts by new retail developments, new

---

[10]Plaintiffs take issue with the fact that Defendant identified no further or additional sources of secondary effects when the County subsequently amended Ordinance 451.7.  Whatever motivations the County may have had for subsequent amendments, be it this lawsuit or otherwise, do not detract from its original evidentiary considerations, particularly where the subsequent amendments are *less restrictive* than those first adopted.

14

commercial office developments, hotels and restaurants, and new high-end housing developments.

Plaintiffs question any actual good faith reliance upon the cited data and studies because they are outdated, not from comparable cities, and/or also involve bars and not just sexually oriented businesses. But waiting for localized proof of adverse secondary effects is not required. *Barnes,* 501 U.S. at 584 (Souter, J., concurring); *Triplett,* 40 F.3d at 134 ("requiring affirmative evidence of a secondary effects motivation ... imposes a burden on the City that Justice Souter's opinion [in *Barnes*] seems designed to avoid"). Reliance on other cities' data is acceptable, if the legislature "reasonably believed it to be relevant to the problem." *Renton,* 475 U.S. at 51-52. While the government entity must demonstrate the relevance of studies and experiences of other areas to the problem it is addressing, *Renton,* 475 U.S. at 51-52, here the Fiscal Court did so. Hired consultants Kelly and Cooper examined the various studies and discussed which ones pertained to similar adult clubs and distinguished those dealing with bars only. Moreover, many of the other studies relied upon by the Fiscal Court are studies that were also conducted by Kelly and Cooper, and about which they have first-hand knowledge.

Plaintiffs challenge the Fiscal Court's true objective by pointing to the timing of the data and information purportedly relied upon by it. But while Plaintiffs argue that such evidence of negative secondary effects must be brought forth before the ordinance is enacted, relying upon *Peek-A-Boo Lounge of Brandenton, Inc. v. Manatee County, Florida,* 337 F.3d 1251, 1266 (11th Cir. 2003), Plaintiffs fail to demonstrate the above information was not provided beforehand. The preamble indicates its consideration prior to enactment. Indeed, the study completed by Kelly and Cooper was the culmination of efforts that began

15

Case: 2:04-cv-00212-DLB   Doc #: 53   Filed: 09/30/06   Page: 16 of 38 - Page ID#: 2209


in 2003, when the Planning Commission first contacted Duncan Associates about conducting the study. They presented this information to the Fiscal Court at the first public reading/hearing on the proposed ordinance. While Plaintiffs contend that conclusory statements in a preamble are insufficient absent actual information in the legislative record and receipt of this information by a majority of council members, there was a record established here of information given to Fiscal Court members prior to enactment. Legislators can act based on recommendations from knowledgeable persons who have reviewed the studies, in place of actually reviewing the studies themselves. *Lakeland Lounge of Jackson, Inc. v. City of Jackson,* 973 F.2d 1255, 1258-59 (5th Cir. 1992).

Plaintiffs submit the County must produce some evidence of actual local adverse secondary effects its regulation is intended to eliminate, citing *J&B Entertainment, Inc. v. City of Jackson,* 152 F.3d 362, 371 (5th Cir. 1998). Plaintiffs also rely heavily upon the Eleventh Circuit's decision in *Flanigan's Entertainment, Inc. v. Fulton County, Georgia,* 242 F.3d 976, 985 (11th Cir. 2001). Plaintiffs' reliance on *Flanigan's Enterprises* is misplaced. In that case, the county commissioned its own study of sexually oriented businesses in the area. It then adopted an ordinance restricting location and operation of adult business in the county. The county argued that in doing so, it relied upon secondary effect studies of other cities. But the court found that the county could not rely upon remote studies upon which to base its interest in combating negative secondary effects when its own studies suggested the businesses in the county actually caused little to no negative secondary effects.

*Flanigan's Enterprises* is distinguishable from this case. There, the court rejected the notion that the county could turn to data of other cities after its own study did not evidence the secondary effects it sought to combat. In this case, the study and report by Kelly and Cooper does demonstrate some of the negative effects sought to be minimized by the County licensing program. Most noteworthy within that study were their observations and collection of data relating to efforts at physical contact with entertainers during stage performances, the commingling between entertainers and customers both before the stage performance in order to solicit juke box monies and after performances to promote private drink "conversations" involving varying degrees of physical contact, including contact of a sexual nature often in poorly lit areas dependent upon the dollar amount paid to purchase a drink and conversation with the entertainer. Kelly and Cooper observed instances of significant physical contact, the exact nature and degree being obscured by lighting or booth conditions. The most significant revenue received by the entertainer and the establishment was through purchase of conversation time. Information provided to Kelly and Cooper by establishment employees included disclosure that oral sex sometimes occurred during these drink conversations. Most significant was the arrest of three women for prostitution at one of the named Plaintiff establishments in the interval of Kelly and Cooper's study.

Plaintiffs emphasize that the Kelly and Cooper study found their establishments "well-managed," and suggest this means evidence of actual negative secondary effects is lacking. The above discussion demonstrates otherwise, particularly with respect to the three prostitution arrests and the admissions from entertainers from at least some of the establishments that oral sex has occurred during the purchased private conversations.

17

And while the study did comment on the effective management at some of the establishments, it also noted management's heavy involvement and facilitation of purchased conversations, where the highest profit return for the club and entertainer are realized. Thus, even though Plaintiffs seeks to downplay what "few incidents" have occurred, that they occurred is nonetheless significant. This information looked to by the Fiscal Court is also supported by the testimony of the County Police Chief at the first reading. He related his experiences and observations with area adult establishments during his tenure in law enforcement. He also provided information on the 1999 report of the FBI's investigation of area clubs, including the fact that eighty percent of the undercover officers in the establishments were either solicited for prostitution or purchased drugs while there.

The County notes that it is this "opportunity for illicit contact in these establishments [that is] believed to be a primary cause of the undesirable image and secondary effects that attach to communities with sexually oriented businesses" and that this is what its Ordinance seeks to address in order to control the secondary effects of crime and prostitution. Courts should generally accept the expressed purpose of a legislative body, rather than second guess it. *Barnes,* 501 U.S. at 582 (plurality opinion). Governments are permitted to rely upon studies of their choice and experiment with their own regulation of secondary effects of adult entertainment. *See Alameda Books,* 535 U.S. 425. It is not the Court's role to "apprise the wisdom" of legislative discretion or serve as a "super-legislature." *Renton,* 475 U.S. at 52 (quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71 (1976)). As is noted by the Fiscal Court, the Sixth Circuit has approved other ordinances wherein the intent and interest are similar to what Kenton County seeks to

18

accomplish by its ordinance. *Deja Vu of Nashville, Inc. v. Metro Gov't of Nashville & Davidson Co.,* 274 F.3d 377 (6th Cir. 2001); *DLS, Inc. v. City of Chattanooga,* 107 F.3d 403 (6th Cir. 1997).

The Court concludes that Ordinance 451.12 seeks to regulate activities within adult entertainment cabarets not with respect to the erotic message itself, but the secondary effects associated with the message and presence of such establishments. This includes, as noted by the County, increased prostitution and opportunities for prostitution, increased crime, particularly sex crimes, increased transmission of sexual disease threatening public health, increased demand on law enforcement, and disintegration of societal order and morality generally. The Kenton County Fiscal Court had sufficient information before them to conclude that the presence of the clubs was causing or conditions existed threatening negative secondary effects, and is entitled to rely upon that information in seeking to combat these effects by efforts at regulation. Thus, the provisions of the Ordinance challenged by Plaintiffs will be evaluated as content-neutral regulation having an incidental effect on protected speech under the test of *O'Brien*, since the enforcement of the ordinance is regardless of the erotic message conveyed.

### C.  **Application of the O'Brien Test**

*United States v. O'Brien* requires that an ordinance (1) be within the constitutional power of the government; (2) further an important or substantial governmental interest; (3) provide an asserted governmental interest unrelated to the suppression of free expression; and, (4) ensure that any incidental restriction on alleged First Amendment freedoms is no greater than essential.

19

(1)    **Is the ordinance within the constitutional power of the Kenton County Fiscal Court**

Protection of public health, safety, and welfare falls within the constitutional police powers of local government. *Barnes,* 501 U.S. at 567 (public indecency statutes are "clearly within the constitutional power of the State"); *DLS, Inc.,* 107 F.3d at 410 ("the constitutional power of the [government entity] to enact this ordinance is not at issue"). Under this precedent, ordinarily there would be no question that the Fiscal Court is empowered to enact such laws. Although typically the police power of the government is not in issue, certain Plaintiffs in this case have challenged the County's authority to regulate them. They do so on two fronts, both of which are related to the prior 1999 litigation involving some of the named Plaintiffs herein and the City of Covington. That lawsuit culminated in a voluntary resolution between the City and those Plaintiffs, reflected in a written settlement agreement. The claims between those parties having been amicably concluded, the presiding judge thereafter dismissed the action. These Plaintiffs maintain that, because of this prior settlement, the County's efforts to enforce an adult business ordinance against them violates the Contract Clause and the Separation of Powers doctrine. However, these asserted claims do not otherwise serve to diminish the County's police power to enforce the adult business Ordinance against them.

(a)    **Contract Clause**

Article 1, section 10, clause 1 of the United States Constitution prohibits the states from enacting any "Law impairing the Obligation of Contracts. . . ." U.S. Const. Art. 1, § 10, cl. 1. Plaintiffs argue that Kenton County's Ordinance is subsequent state law impairing

20

their contract rights with the City of Covington in contravention of the Contract Clause and is therefore unconstitutional.

By statute, Kentucky's cities are permitted to "exercise any power and perform any function within its boundaries, ... that is in furtherance of a public purpose of the city and not in conflict with a constitutional provision or statute." K.R.S. § 82.082(1). Pursuant to this status, a city therefore can pass ordinances "that are in addition to, yet not inconsistent with, state statutes and constitutional provisions." *City of Louisville v. Woods,* 883 S.W.2d 881, 883 (Ky. Ct. App. 1993). In furtherance of the City's public purposes, Covington has in place an ordinance, No. O-17-99, providing for the licensing and regulation of adult businesses.

Kenton County, under the "Home-Rule Act," has also been delegated authority by the state legislature to regulate various areas, including adult businesses. K.R.S. § 67.083. That "Home-Rule Act," passed as emergency legislation in 1998, bestowed upon fiscal courts the authority to regulate adult businesses. That statute reads:

> (3) The fiscal court shall have the power to carry out governmental functions necessary for the operation of the county. Except as otherwise provided by statute or the Kentucky Constitution, the fiscal court of any county may enact ordinances, issue regulations, levy taxes, issue bonds, appropriate funds, and employ personnel in performance of the following public functions:
>
> (z) Regulation of establishments or commercial enterprises offering adult entertainment and adult entertainment activities.

K.R.S. § 67.083(3)(z).

The County's passage of Ordinance No. 451.7 was a valid exercise of that power delegated by the state legislature. In fact, and as noted by Plaintiffs, Kenton County had passed an ordinance regulating adult businesses prior to enacting Ordinance No. 451.7;

21

Case: 2:04-cv-00212-DLB Doc #: 53 Filed: 09/30/06 Page: 22 of 38 - Page ID#: 2215

apparently that earlier ordinance exempted the incorporated areas of the County from its enforcement and so was not enforced within the City of Covington limits. *See also C&H Entertainment, Inc. v. Jefferson Co. Fiscal Court,* 169 F.3d 1023, 1026-27 (6th Cir. 1999)(noting that, in amending § 67.083 in 1998 to explicitly include adult business establishments as among those areas over which the fiscal court may regulate, the Kentucky General Assembly remarked that it had always intended by this statute to bestow authority over such to fiscal courts).

The Home Rule Act further provides that county ordinances are enforced throughout the county unless "[t]he legislative body of any city within the county has adopted an ordinance pertaining to the same subject matter which is the same as or more stringent than the standards that are set forth in the county ordinance." K.R.S. § 67.083(7)(b). Plaintiffs contend that Kenton County's Ordinance is not enforceable within the City of Covington because the penalties in the City's Ordinance for violation thereof are more stringent than those provided by the County Ordinance. However, the stringency referred to in the statute relates to the "standards" of the County ordinance. As pointed out by Kenton County, and which Plaintiffs fail to refute, the standards of Ordinance No. 451.12 are more stringent in that, for example, they call for a wider "buffer zone" between patrons and the stage and require greater managerial oversight of clubs. Therefore, to the extent that Plaintiffs challenge the County's exercise of police power over them due to the fact that the City of Covington also has a licensing scheme in place, the Court concludes that § 67.083(7)(b) does not preclude enforcement of the County's Ordinance within the City of Covington.

22

The Supreme Court has said that "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 410 (1983). The Supreme Court has thus developed a three-part test to determine whether the application of a state statute results in an unconstitutional impairment of a contract. See *Linton v. Comm. Health and Environment, State of Tennessee,* 65 F.3d 508, 517 (6th Cir. 1995) (*citing Energy Reserves,* 459 U.S. at 411-12). First the court must evaluate "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." Second, if the law has substantially impaired a contractual relationship, the state "must have a significant and legitimate public purpose" to justify the statute, "such as the remedying of a broad and general social or economic problem." Third, once a legitimate public purpose has been identified the court must determine whether the adjustment of contractual rights and responsibilities caused by the statute "is based on reasonable conditions and is 'of a character appropriate' to the purpose" of the statute. *Energy Reserves,* 459 U.S. at 411 (quoting *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 22 (1977)).

In considering the first factor – "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship," *Energy Reserves,* 459 U.S. at 411 – courts must determine whether: (1) a contract exists; (2) a change in law impairs that contract; and (3) the impairment is substantial. *Linton,* 65 F.3d at 518 (citing *General Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992)). Assuming *arguendo* that the Contract Clause is appropriately implicated in this case, Plaintiffs have failed to persuade this Court

23

that Kenton County's Ordinance operates as a substantial impairment of a contractual relationship. The County's adoption of its Ordinance does not impair any contract that may exist between Plaintiffs and the City, substantially or otherwise. The validity and enforceability of the settlement agreement contract is doubtful, most certainly as against any parties other than the City of Covington. In rejecting Contract Clause claims of private parties, the Supreme Court has long recognized that government entities lack the power to contract away certain of their police powers. *See Stone v. Mississippi,* 101 U.S. 814 (1880)(legislature cannot bargain away public health and morals).

Nor does the County's Ordinance, as a "change in law," substantially impair the Plaintiffs' contract. The settlement agreement and promises made by the City of Covington in exchange for dismissal of that action pertain to Covington's ordinance and enforcement of that ordinance against Plaintiffs. The settlement was not a promise by the City to Plaintiffs to refrain from any and all regulation against them, nor could the City so promise since it lacked actual or apparent authority to do so. Plaintiffs are not precluded from seeking the benefit of whatever bargain it believes the City conveyed to it in exchange for dismissal of the lawsuit. However, the public health and morals cannot be bargained away, nor can other police powers. While the City made concessions on how it would regulate certain Plaintiffs, it did not represent that it is the sole and exclusive regulatory authority over adult businesses within the City, nor could it do so given the 1998 Home Rule Act and K.R.S. § 67.083. Moreover, the Contracts Clause is implicated when subsequent action retroactively impairs contracts, not prospective impact. In presenting their claim, Plaintiffs fail to articulate how legislation by Kenton County pursuant to legitimately delegated authority retroactively impairs Plaintiffs' settlement contract rights with Covington.

24

And even if the County's Ordinance somehow does substantially impair Plaintiffs' settlement contract, the Contracts Clause nevertheless is not violated because the County has a significant and legitimate public purpose to justify the statute. County regulation of adult establishments is one of the expressly enumerated areas in the statute warranting a county's exercise of its police powers. Here, Kenton County did so in furtherance of the public health, safety and welfare.

> It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.

*Manigault v. Springs,* 199 U.S. 473, 480 (1905). Thus, the Contract Clause does not operate to obliterate the police power of the States. By contracting, parties "may not estop the legislature from enacting laws for the public good." *Id.* A significant and legitimate public purpose to justify the Ordinance has been demonstrated by the County.

Finally, the "adjustment" of Plaintiffs' contractual rights caused by the County's Ordinance is based on reasonable conditions and "of a character appropriate" to the purpose of the legislation. *Energy Reserves,* 459 U.S. at 412. As it pertains to the Plaintiffs' bargained for arrangement with how the City would regulate it, such contractual rights have not been "adjusted." To the extent Plaintiffs believe they can legitimately pose that the contract they entered into precluded regulation by any other governmental body and that this "exclusivity" has now been "adjusted," these "adjustments" are minimal and "of a character appropriate" to the purpose of the County ordinance. They call for minimum

25

lighting and patron-dancer distances, manager presence and visibility, and fees more reflective of the cost to actually enforce the Ordinance. That these are reasonable adjustments appropriate to the legislation's purpose of furthering the health, safety, and welfare of the public is perhaps best demonstrated by the fact that under the standards then in place by the City of Covington, three prostitution arrests occurred at Liberty's, one of the Plaintiffs herein and a party to the settlement agreement with the City of Covington.

Thus, the Court finds that the County ordinance does not serve as a retroactive impairment of a settlement contract between Plaintiffs and the City of Covington that gives rise to consideration of the Contract Clause. Even if the Contract Clause was implicated, the Clause has not been violated because the Ordinance does not substantially impair Plaintiffs' contract rights with the City or, to the extent it does, there is a significant and legitimate public purpose behind the Ordinance so as to render it constitutional.

#### (b)    Separation of Powers

Also in the nature of a challenge to the County's police authority is Plaintiffs' further contention that enforcement of Kenton County's Ordinance against certain of these Plaintiffs who were also plaintiffs in the prior suit violates the separation of powers doctrine. The constitutional principle that one branch of government is prohibited from "encroaching on the central prerogatives of another," is a principle better known as separation of powers. *Miller v. French,* 530 U.S. 327, 341 (2000). The Court questions whether Plaintiffs' assertion is misplaced, given that they seek to challenge the so-called encroachment of state legislative action upon the federal judicial branch. But regardless, a separation of powers concern is not implicated here.

26

Article III, Section 1 prohibits Congress from undoing final judgments of the courts. *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 220-24 (1995). "A legislature without exceeding its province cannot reverse a determination once made in a particular case; though it may prescribe a new rule for future cases." The Federalist No. 81, at 545 (J. Cooke ed. 1961)(Alexander Hamilton's commentary on Art. III, sec. 1); *see also United States v. O'Grady,* 22 Wall. 641, 647-48 (1875)("Judicial jurisdiction implies the power to hear and determine a cause, and ... Congress cannot subject the judgments of the Supreme Court to the re-examination and revision of any other tribunal"); *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 18 How. 421, 431 (1856)("it is urged, that the act of congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby").

Here, however, Plaintiffs seek to take a private settlement agreement and transform it into a final adjudication by this Court. While the Supreme Court has indicated that a consent decree, although contractual in nature, may be viewed and enforced as a judicial decree, *Rufo v. Inmates of Suffolk Jail,* 502 U.S. 367, 378 (1992), that this view would also be extended to an order such as that entered in this case is questionable. Once the private settlement was reached, and document entitled "Settlement Agreement" executed, the parties in the prior action submitted an "Order/Stipulation of Dismissal with Prejudice." That document reflected the parties had entered into a settlement agreement, that a copy of the agreement is "attached," and that the action is dismissed as settled. The Order/Stipulation fails to indicate that the agreement and its terms are either adopted by the Court or incorporated by reference. The document did not reserve continuing authority

27

or jurisdiction before the presiding judge for enforcement or other purpose. The presiding judge was not called upon to make findings of fact or conclusions of law, or otherwise to adjudicate the merits of the case or validity of the settlement.

"Article III 'gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy.'" *Miller v. French,* 530 U.S. at 342 (quoting *Plaut,* 514 U.S. at 218-19). This Court does not believe that this prior Order/Stipulation constitutes a decision saying "what the law is," *Plaut,* 514 U.S. at 218, for purposes of a final judgment by an Article III court that the legislature now seeks to review.

Moreover, if the Order/Stipulation in the prior action could be viewed as a final judgment, the actions of Kenton County in passing the Ordinance did not violate constitutional separation of judicial and legislative powers. Plaintiffs implicitly argue that the County's Ordinance altered the "decision" in their prior suit. But the Ordinance merely subjects them to further, additional regulation. To the extent they argue that they and the City agreed upon their future regulation, and that this is the only regulation to which they can be subjected, effectively enjoining any other regulation of their adult businesses, this is an erroneous legal conclusion about how separation of powers operates. As the Supreme Court has explained,

> when Congress changes the law underlying a judgment awarding prospective relief, that relief is no longer enforceable to the extent it is inconsistent with the new law. Although the remedial injunction here is a "final judgment" for purposes of appeal, it is not the "last word of the judicial department." . . . The provision of prospective relief is subject to the continuing supervisory jurisdiction of the court, and therefore may be altered according to subsequent changes in the law. . . . Prospective relief must be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law. . . . see also

28

> *Railway Employees v. Wright,* 364 U.S. 642, 646-47 (1961)(a court has the
> authority to alter the prospective effect of an injunction to reflect a change in
> circumstances, whether of law or fact, that has occurred since the injunction
> was entered) . . . .

*Miller v. French,* 530 U.S. at 347-48 (internal citations omitted).

Thus, separation of powers concerns are not implicated in this case, given the lack

of a final judgment or adjudication by the federal court in the prior litigation, combined with

the fact that the subsequent legislative action was by a county pursuant to delegated

authority by the Kentucky General Assembly. But assuming it was implicated, the County's

enactment of the Ordinance does not encroach upon the judicial branch, since any

prospective relief on the nature and extent of regulation over Plaintiffs' businesses is

subject to further judicial review and alteration for subsequent changes in the law.

### (2)   Does the Ordinance provide for a government interest unrelated to suppressing free expression

The County's constitutional power having been determined, the Court returns to

consideration of the *O'Brien* factors.  Kenton County submits the general goals of its

licensing scheme are to prevent the incidence and spread of crime, particularly sex-related

crimes, illegal drugs, and disease.  These have been recognized as important government

interests.  *DLS, Inc.,* 107 F.3d at 410 ("courts have repeatedly found the prevention of

crime and disease to satisfy this part of the *O'Brien* test")(citing *Barnes, Renton,* and

*Triplett).* Moreover, *Barnes* also recognized that societal order and morality can also serve

as legitimate governmental interests warranting protection.  *Barnes,* 501 U.S. at 568;

*Renton,* 475 U.S. at 50 ("a city's interest in attempting to preserve the quality of urban life

is one that must be accorded high respect").  Plaintiffs do not and of course cannot argue

29

that not preventing crime or the spread of disease are integral to their erotic expression; consequently, the County's interest in reducing such secondary effects is not directly related to suppressing the message communicated through erotic dance. *Barnes,* 501 U.S. at 585 ("On its face, the governmental interest in combating prostitution and other criminal activity is not at all inherently related to expression.").

> **(3)    Does the Ordinance further the governmental interest, while ensuring that incidental restriction upon First Amendment speech is no greater than essential**

The remaining two considerations strike at the heart of Plaintiffs' challenges to various provisions of Kenton County's Ordinance. Immediately below the Court considers these factors in the context of each challenged sections.   In examining whether the ordinance is no greater than essential to and furthers the County's objectives, the Court is mindful and informed that "no greater than essential" does not mean "least restrictive means available." *Ward v. Rock Against Racism,* 491 U.S. at 798.  As interpreted in *Barnes,* it means substantially the same as being "narrowly tailored" to further governmental interest. *Barnes,* 501 U.S. at 572. "Narrow tailoring is satisfied so long as the ... regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation," with the burden on speech, if any, being not substantially broader than necessary to achieve the government's goal. *Ward,* 491 U.S. at 897-99. Even if the government's objective could be adequately served by an alternative less restrictive upon speech, it is not invalid simply for that reason. *Id.*

> **(a)    Staging Requirements and Buffer Zone**

30

The Ordinance requires that dancing take place in an open room of at least 600 square feet, on a stage elevated at least 24 inches above seating, and with a horizontal separation ("buffer zone") of at least 5 feet.  Tips are to be collected in containers accessible to patrons but not located on the stage.

Plaintiffs' argument in opposition to these staging requirements and buffer zone is a very general one; namely, that Defendant gives no reasoning for this restriction on First Amendment protected activity of erotic dancing and that the mere prospect of crime does support restricting protected speech.  They submit that the Kelly and Cooper study revealed no secondary effects arising from the dance performances that would support a legitimate interest being furthered by the buffer zone.

However, and as Defendant points out, preventing undesirable consequences is within the concept of the public welfare that defines the limits of police power. *American Mini Theatres,* 427 U.S. at 74-75.  Plaintiffs essentially propose virtually a direct cause and effect between staging and negative secondary effects, when no such direct link is constitutionally required.  The buffer zone and staging requirements serve to distance an entertainer from the patron while engaged in an erotic performance.

After all, it is the erotic performance which is worthy of constitutional protections, not a performance which involves touching by patrons.  Such separation reduces the opportunity for prostitution and narcotics transactions.  Direct contact between a dancer and patron during a performance has been shown, even in the Kelly and Cooper study, to bring about unruly exchanges between performers and patrons and necessitate involvement of bouncers and police. And, in general, provisions ensuring some semblance of order and control over performances and prohibiting a "free for all," carousing

31

atmosphere furthers prevention of adult cabarets as contributing to a decline in community image. *Pap's A.M.,* 529 U.S. at 300 ("requiring dancers to wear pasties and G-strings may not greatly reduce the secondary effects, but *O'Brien* requires only that the regulation further the interest in combating these effects").

In *DLS, Inc.* the Sixth Circuit upheld as constitutional a comparable buffer zone requirement and 18-inch stage elevation. *DLS, Inc.,* 107 F.3d at 412, 413 ("while it is probable that each marginal foot of buffer zone achieves goals somewhat less efficiently, it is not for us to say that a seven-foot zone or a five-foot zone would strike a better balance."). And in *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County,* 274 F.3d 377, 396-97 (6th Cir. 2001), *cert. denied,* 122 S. Ct. 1952 (2002), the Sixth Circuit upheld a three-foot "no touch" buffer zone as a valid regulation on erotic speech, although the court ultimately struck down the statute on other grounds. Lower courts within the district have also upheld such provisions. *See Kentucky Restaurant Concepts, Inc. v. City of Louisville,* 209 F. Supp. 2d 672 (W.D. Ky. 2002)(upholding validity of buffer zone); *Threesome Entertainment v. Strittmather,* 4 F. Supp. 2d 710 (N.D. Ohio 1998)(six-foot buffer zone held constitutional). Other courts have also recognized that such "no touch" and elevated stage provisions are not overly intrusive upon protected expression. *See, e.g., Kev, Inc. v. Kitsap Co.,* 793 F.2d 1053, 1061 (9th Cir. 1986)("While the dancer's erotic message may be slightly less effective from ten feet [the buffer at issue], the ability to engage in the protected expression is not significantly impaired."); *DFW Vending, Inc. v. Jefferson County,* 991 F. Supp. 578, 594 (E.D. Tex. 1998)("Six feet is sufficiently close for a person to view and appreciate an artistic dance

32

performance.  Indeed, that distance is closer than distances at which artistic dances at theaters and concert halls are generally viewed."); and *Colacurcio v. City of Kent,* 944 F. Supp. 1470, 1476 (W.D. Wash. 1996)(while communicating and receiving a dancer's message "is more intense, more personal, more erotic if the dancer is close," ... "there is nothing in constitutional jurisprudence to suggest that patrons are entitled under the First Amendment to the maximum erotic experience possible").

Here, Kenton County Ordinance 451.12 prescribes a buffer zone of five feet and that the expressive dance be performed on an elevated stage.  These conditions are sufficiently tailored to further the governmental interests at stake, while not restricting First Amendment freedoms more than is essential.  These provisions are, therefore, found to be constitutional.

### (b)    Operational Hours Restriction

Kenton County's Ordinance prohibits establishments from being open between 2:30 a.m. and 12:00 noon.  Plaintiffs challenge this provision as being a time, place, and manner restriction on speech having such an unduly intrusive economic impact as to render it constitutionally unreasonable.  They analogize it to the broadcasting hours restriction imposed upon the Playboy Channel that was ultimately struck down by the Supreme Court in *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 809 (2000), after finding the law constituted a significant communications restrictions and consequent revenue reduction.  Plaintiffs also submit that the County's actual target by the provision was their First Amendment expression, since other businesses not offering such expression do not have their operational hours restricted.

33

These arguments are unpersuasive, for a number of reasons. First, Plaintiffs have not disputed Defendant's assertion that none of the present establishments is open for business outside of the Ordinance's time restrictions. Therefore, what actual economic impact will result is not specified by Plaintiffs. Moreover, these sexually oriented businesses are not channels broadcasting over television airwaves, as in *Playboy Entertainment.* They are business establishments present on local streets sharing space with other non-sexually oriented businesses providing products and services for citizens' everyday lives that do not have associated negative secondary effects as do adult entertainment venues. As this Court found in upholding a 6:00 p.m. until 2:30 a.m. hours provision in *Bright Lights, Inc. v. City of Newport,* 830 F. Supp. 378, 389 (E.D. Ky. 1993), "the restriction of hours serves the legitimate purpose of confining to evening hours the illicit and immoral practices that accompany [adult cabarets] and concentrate around [adult cabarets]." Here, the hours are not as restrictive as those found to be constitutional in *Bright Lights.*

The Sixth Circuit more recently rejected a First Amendment constitutionality challenge to an "hours of operation" restriction for adult cabarets. In *Deja Vu of Cincinnati, L.L.C. v. Union Township Board of Trustees,* 411 F.3d 777, 789 (6th Cir. 2005) the court held that a midnight close restriction on adult cabarets was a reasonable time, place or manner restriction on protected speech. *Id.* In so concluding, it noted that the provision's validity was driven by whether (1) it served a significant government interest, (2) was narrowly tailored to that purpose, and (3) left open ample alternative channels for communication of the information. *Id.* (quoting *Clark v. Cmty for Creative Non-Violence,*

34

468 U.S. 288, 293 (1984), which had noted that the four-factor *O'Brien* standard "for validating a regulation of expressive conduct... is little, if any, different from the standard applied to time, place, or manner restrictions").

The court in *Deja Vu of Cincinnati* found that the restriction furthered the governmental interest in protecting public health, safety, and welfare generally, and in combating already recognized harmful secondary effects of crime and other public health and safety problems associated with nude dancing and caused by the presence of such establishments specifically. *Id.* at 790 (quoting *Pap's A.M.,* 529 U.S. at 296). Nor was the restriction not narrowly tailored merely because it required cabarets without liquor licenses to close at midnight even though those with liquor licenses could remain open later pursuant to state liquor laws. *Id.* at 790-91 (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 798 (1989)(holding that while "a regulation of the time, place, or manner of protected speech must be narrowly tailored[,] ... it need not be the least restrictive or least intrusive means of doing so")). Finally, the court found that because cabarets could be open for twelve hours per day, six days per week, ample channels for expressive communication were available. *Id.* at 791.

These considerations from *Deja Vu of Cincinnati* are no less compelling here. Although in *Deja Vu of Cincinnati* the court concluded that the township's reliance upon other cities' studies of the harmful effects from adult cabarets was acceptable support, here the Kenton County Fiscal Court had its own study in addition to those of other cities. And the operational hours permitted under Kenton County's Ordinance – noon until 2:30 a.m.,

35

exceed those found acceptable for engaging in constitutionally protected expressive conduct in *Deja Vu of Cincinnati.*

### (c)    Licensee Disclosure Requirements

Sections 6 and 7 of Kenton County's Ordinance call for business and individual applicants to disclose information including name, address, telephone number, social security number, addresses for previous five-year period, history in any business regulated by the Ordinance, prior license revocations or suspensions and why, prior occupations for immediate three-year period, corporate applicant's agent for service of process, and for establishment applicants, a floor plan depicting various club interior details.  Plaintiffs contend these provisions improperly invade an applicant's right to privacy and can serve to chill the exercise of First Amendment expression.

None of the authorities relied upon by Plaintiffs stands for the assertion that one engaging in the regulated industry of sexually oriented entertainment is free from what are otherwise reasonable disclosure requirements because such requirements unnecessarily intrude upon or deter protected erotic expression.  Government offices have a legitimate government interest in ascertaining who is legally accountable for regulated sexually oriented businesses.

In *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County,* the Sixth Circuit held that the disclosure of what was otherwise private, identifying information such as name, physical features, date of birth and current and prior addresses, used to facilitate background checks and continuing compliance and enforcement, served in furtherance of eradicating secondary effects of sexually oriented businesses.  274 F.3d

36

at 393-94. Plaintiffs in *Deja Vu of Nashville* failed to persuade the court that requiring this information did not facilitate enforcement, and it was up to "'those challenging the legislative judgment [to] convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision maker.'" *Id.* at 394 (quoting *Vance v. Bradley,* 440 U.S. 93, 111 (1979)).

The *Deja Vu of Nashville* court did, however, find somewhat persuasive plaintiff's argument that the disclosure provision posed more than an incidental burden on First Amendment rights. Similar to what Plaintiffs argue in the matter now before this Court, in *Deja Vu of Nashville* the plaintiffs protested that their private information could be obtained by members of the public with illicit motives, thereby resulting in a chilling effect upon their activities. *Id.* Ultimately the court rejected this argument, after finding that its decision in *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1064-65 (6th Cir. 1998), which prohibited public release of applicant identifying personal information as exempted from the state open records acts, applied to prohibit government officials from disclosing personal information from plaintiffs. *Deja Vu of Nashville,* 274 F.3d at 394-95. Thus, because the government entity was prohibited from publicly releasing such private information and instead required to maintain it under seal, the disclosure requirement was found not unconstitutional as "essential to ensuring continuing compliance with the Ordinance's licensing and permitting requirements, and because the reporting requirements pose only an incidental burden on applicants." *Id.* at 395. *See also Kentucky Restaurant Concepts, Inc. v. City of Louisville,* 209 F. Supp. 2d at 684-86 (conducting similar analysis on

37

disclosure requirements pursuant to *Deja Vu of Nashville* and likewise upholding the disclosure of private information provisions and finding that the public disclosure of such information was exempted under Kentucky's Open Records Act).   Based on these authorities, the Court rejects Plaintiffs' constitutional challenge to the licensee disclosure requirements.

### (d)   Civil Disabilities Provision

The County Ordinance as originally challenged by Plaintiffs prohibited approving an application where the applicant or applicant's spouse had been convicted of a sex offense or other specified crime within the previous ten years.   Plaintiffs challenge this provision as an impermissible prior restraint on their First Amendment rights.   They submit that under *Near v. Minnesota,* 283 U.S. 697, 713 (1931), it is constitutionally suspect to deny one a license based on prior convictions.

The Ordinance as now amended calls for the license inspector to deny a license if the applicant has been convicted of a crime of a sexual nature or a gambling or controlled substance offense in the prior five-year period.   Defendant argues Plaintiffs lack standing to challenge this provision, since no application has been submitted and denied based upon criminal history, so no injury in fact has occurred.   However, Plaintiffs present a First Amendment facial challenge to the Ordinance, and a plaintiff need not go through the formality of submitting an application in a facially unconstitutional licensing scheme.   *See Freedman v. Maryland,* 380 U.S. 51, 56 (1965).

As the Fiscal Court points out, absence of certain criminal convictions as a condition to license approval has been upheld within this circuit specifically in the context of adult

38